UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* JAMES A. ROARK, SR. and MICHAEL L. DAVIS | Civil Action File No. |
| Plaintiffs, | 2:19-cv-1047-RMG |
| v. | **FILED UNDER SEAL** |
| | Pursuant to 31 U.S.C. §3730(b) |
| MEDICAL UNIVERSITY OF SOUTH CAROLINA; UNIVERSAL HEALTH SERVICES d/b/a AIKEN REGIONAL MEDICAL CENTERS, INC.; GRAND STRAND REGIONAL MEDICAL CENTER, LLC; PRISMA HEALTH f/k/a PALMETTO HEALTH RICHLAND; MAIMONIDES MEDICAL CENTER; STATE UNIVERSITY OF NEW YORK UPSTATE UNIVERSITY HOSPITAL; BANNER UNIVERSITY MEDICAL CENTER SOUTH; BELLEVUE HOSPITAL; NEW YORK UNIVERSITY LANGONE TISCH HOSPITAL; ATLANTIC HEALTH SYSTEM d/b/a MORRISTOWN MEDICAL CENTER; STATE UNIVERSITY OF NEW YORK DOWNSTATE MEDICAL CENTER UNIVERSITY HOSPITAL OF BROOKLYN; UCHEALTH UNIVERSITY OF COLORADO HOSPITAL; ALLEGHENY GENERAL HOSPITAL; NEW YORK-PRESBYTERIAN HOSPITAL/WEILL CORNELL MEDICAL CENTER; UNIVERSITY OF MISSOURI HOSPITAL; ST. LUKE'S-ROOSEVELT HOSPITAL CENTER d/b/a MOUNT SINAI ST. LUKE'S; MAYO CLINIC HOSPITAL –SAINT MARY'S HOSPITAL; UCSF MEDICAL CENTER; UNIVERSITY OF PITTSBURGH MEDICAL CENTER PRESBYTERIAN HOSPITAL; MEMORIAL HERMANN – TEXAS MEDICAL CENTER; MASSACHUSETTS GENERAL HOSPITAL; NORTHWELL HEALTH d/b/a LONG | **FALSE CLAIMS ACT COMPLAINT** **DO NOT PLACE IN PRESS BOX DO NOT ENTER ON PACER** JURY TRIAL DEMANDED |

ISLAND JEWISH MEDICAL CENTER;
JOHN DOE HOSPITALS 1-86.

                                    Defendants.

## COMPLAINT

COMES NOW Relators James A. Roark, Sr. and Michael L. Davis, on behalf of the United States of America, and files this qui tam action against Defendants, Medical University of South Carolina; Universal Health Services doing business as Aiken Regional Medical Centers, Inc.; Grand Strand Regional Medical Center, LLC; Prisma Health formerly known as Palmetto Health Richland; Maimonides Medical Center; State University of New York Upstate University Hospital; Banner University Medical Center South; Bellevue Hospital; New York University Langone Tisch Hospital; Atlantic Health System doing business as Morristown Medical Center; State University of New York Downstate Medical Center University Hospital of Brooklyn; UCHealth University of Colorado Hospital; Allegheny General Hospital; New York-Presbyterian Hospital/Weill Cornell Medical Center; University of Missouri Hospital; St. Luke's-Roosevelt Hospital Center doing business as Mount Sinai St. Luke's; Mayo Clinic Hospital – Saint Mary's Hospital; University of Pittsburgh Medical Center Presbyterian Hospital; Memorial Hermann – Texas Medical Center; Massachusetts General Hospital; Northwell Health doing business as Long Island Jewish Medical Center, and John Doe Hospitals 1-86 (collectively "the Defendant Hospitals"), for their knowing acts and omissions in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq.*

## INTRODUCTION

1.     Recognizing the increased patient care costs associated with teaching activities, the Medicare Program provides an additional Indirect Medical Education payment adjustment to Medicare's prospective payment rates for inpatient services provided at teaching hospitals.

This payment adjustment is intended to capture the indirect costs of medical education, such as the increased number of tests and procedures prescribed by resident physicians ("residents") relative to experienced physicians and the increased hospital staffing required to maintain the teaching program's medical records.

2.      The Indirect Medical Education payment adjustments are a significant source of funding for teaching hospitals.  In 2015, the Medicare program paid over $6.6 billion in Indirect Medical Education payment adjustments.   U.S. Gen. Accounting Office, GAO-18-240, *Physician Workforce:  HHS Needs Better Information to Comprehensively Evaluate Graduate Medical Education Funding* 18 (2018).

3.      The Indirect Medical Education adjustment related to the operating portion of the Medicare payment is calculated using a formula that takes into account, in part, the hospital's ratio of residents to its number of available beds.  For teaching hospitals, this adjustment is added on to the basic price per case for every Medicare discharge paid under the inpatient prospective payment system (IPPS).

4.      As more specifically alleged below, Defendant Hospitals falsely underreported the number of available beds for the operating portion of the Indirect Medical Education payment adjustment calculation in the cost reports the Defendant Hospitals submitted to the Centers for Medicare & Medicaid Services ("CMS") under the Medicare Program.

5.      As a result of submitting these false, underreported available bed counts to Medicare, the Defendant Hospitals caused the Medicare Program to pay them falsely inflated Indirect Medical Education payment adjustments.

6.      The Defendant Hospitals have actual knowledge that they are engaging in illegal misconduct or have recklessly disregarded the relevant laws and regulations.  Defendants have

chosen to profit from fraudulently underreporting their available bed counts in order to falsely inflate the Indirect Medical Education payment adjustments on the operating portion of the Medicare IPPS per-discharge payment.

## JURISDICTION AND VENUE

7.     This is an action by the United States of America *ex rel.* James A. Roark, Sr. and Michael L. Davis, against Defendants to recover damages and civil penalties on behalf of the United States arising from false and/or fraudulent statements, records, and/or claims made and caused to be made by Defendants and/or their agents and employees in violation of the federal False Claims Act, 31 U.S.C. § 3729, *et seq*.

8.     Pursuant to 28 U.S.C. § 1331, Defendants are subject to federal question jurisdiction in this Court because this action arises under the laws of the United States, including the False Claims Act, 31 U.S.C. §§ 3729 and 3730, and other relevant federal statutes. In addition, the False Claims Act specifically confers jurisdiction upon the United States District Court. *See* 31 U.S.C. § 3732(a).

9.     Defendants are subject to jurisdiction and venue in this Court where "one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred." 31 U.S.C. § 3732(a).  Accordingly, jurisdiction and venue are appropriate because, among other reasons, certain Defendant Hospitals can be found, maintain offices, transact business, and reside in South Carolina.  In addition, acts proscribed by 31 U.S.C. § 3729 occurred in the District of South Carolina.  Furthermore, venue is proper in this District under 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a).

10.     Relators have direct and independent knowledge of the information on which the allegations are based and have voluntarily provided disclosure of the allegations of this

Complaint to the United States prior to filing, as required by the statute. None of the allegations set forth in this Complaint are based on a public disclosure of allegations or transactions as defined in 31 U.S.C. §3730(e)(4)(A). Furthermore, if there has been a public disclosure of any of the allegations underlying this action, Relators qualify as original sources of such information, pursuant to 31 U.S.C. §3730(e)(4)(B).

## PARTIES

11.     Plaintiff Relator, James A. Roark, Sr., is a citizen of the United States and a resident of Port Orange, Florida. Relator Roark has extensive experience with Medicare reimbursement issues. In March 1992, the Secretary of Health and Human Services ("HHS") appointed Relator Roark to a three-year term at the Provider Reimbursement Review Board, an independent panel of five members to which a Medicare provider may appeal if it is dissatisfied with a final determination by its Medicare contractor or CMS. Since 1976, Relator Roark has handled reimbursement issues at a number of different hospitals across the country, including Children's Hospital in Washington, D.C. from 2009–2013. Prior to his role at hospitals, Relator Roark handled reimbursement issues as an auditor for insurance and accounting firms. He has also served as a consultant and provided reimbursement assistance to various providers.

12.     Relator Roark's direct and firsthand knowledge of the fraudulent activity discussed herein began when he worked at Children's Hospital. To his knowledge and belief, the Defendant Hospitals' fraudulent conduct began with the cost reports submitted for fiscal year 2011, continued until at least the cost reports submitted by the Defendant Hospitals for fiscal year 2017, and in some cases 2018, and based on information and belief, likely continues today.

13.     Relator Davis is a citizen of the United States and a resident of Washington, D.C. Relator Davis has forty years of experience related to Medicare, Medicaid, and other federally funded healthcare programs and has worked with the White House, House of Representatives, Senate, multiple federal departments and agencies, and state, local, and territorial governments to accomplish their goals and missions.    Relator currently serves as an independent consultant and works on issues related to Medicare, Medicaid, veterans' health, hospitals payments, coding, reimbursements, and education. From 1995–2005, he was President, CEO, and Chairman of his own consulting firm, the primary engagements for which involved Medicare and Medicaid.  From 1975–1995, he was the Director, CEO, and Chairman of a private, for profit minority and veteran consulting firm involved in a number of federal and state engagements.  A Vietnam veteran, Relator Davis also worked for the U.S. Department of Health, Education, and Welfare.

14.     Relator Davis' direct and firsthand knowledge of the fraudulent activity discussed herein began at the end of 2017.  To his knowledge and belief, the Defendant Hospitals' fraudulent conduct began with the cost reports submitted for fiscal year 2011, continued until at least the cost reports submitted by the Defendant Hospitals for fiscal year 2017, and in some cases 2018, and based on information and belief, likely continues today.

15.     Defendant Medical University of South Carolina is a not-for-profit corporation duly existing pursuant to, and by virtue of the laws of South Carolina, with its principal office located at 171 Ashley Avenue, Charleston, South Carolina 29425.

16.     Defendant Universal Health Services doing business as Aiken Regional Medical Centers, Inc. is a corporation duly existing pursuant to, and by virtue of the laws of South

Carolina, with its principal office located at 302 University Parkway, Aiken, South Carolina 29801.

17.    Defendant Grand Strand Regional Medical Center, LLC is a hospital duly existing pursuant to, and by virtue of the laws of the State of Delaware, with its principal office located at 809 82nd Pkwy, Myrtle Beach, South Carolina 29572.

18.    Defendant Prisma Health formerly known as Palmetto Health Richland is a not-for-profit corporation duly existing pursuant to, and by virtue of the laws of South Carolina, with its principal office located at 5 Richland Medical Park Dr., Columbia, SC 29203.

19.    Defendant Maimonides Medical Center is a domestic not-for-profit corporation, duly existing pursuant to, and by virtue of the laws of the State of New York, with its principal office located at 4802 Tenth Avenue, Brooklyn, New York 11219.

20.    Defendant State University of New York Upstate University Hospital is a hospital duly existing pursuant to, and by virtue of the laws of the State of New York, with its downtown campus located at 750 East Adams Street, Syracuse, New York 13210, and its community campus located at 4900 Broad Road, Syracuse, New York 13215.

21.    Defendant Banner University Medical Center South is a domestic not-for-profit corporation duly existing pursuant to, and by virtue of the laws of the State of Arizona, with its principal office located at 2800 East Ajo Way, Tucson, Arizona 85713.

22.    Defendant Bellevue Hospital is a medical institution that is owned and operated by New York City's Health and Hospitals Corporation duly existing pursuant to, and by virtue of the laws of the State of New York, with its principal office located at 462 First Avenue, New York City, New York 10016.

23.    Defendant New York University Langone Tisch Hospital is a domestic not-for-profit corporation duly existing pursuant to, and by virtue of the laws of the State of New York, with its principal office located at 550 First Avenue, New York, New York 10016.

24.    Defendant Atlantic Health System doing business as Morristown Medical Center is a for-profit corporation duly existing pursuant to, and by virtue of the laws of the State of New Jersey, with its principal office located at 100 Madison Avenue, Morristown, New Jersey 07960.

25.    Defendant State University of New York Downstate Medical Center University Hospital of Brooklyn is a corporation duly existing pursuant to, and by virtue of the laws of the State of New York, with its principal office located at 450 Clarkson Avenue, Brooklyn, New York 11203.

26.    Defendant UCHealth University of Colorado Hospital is a domestic not-for-profit corporation duly existing pursuant to, and by virtue of the laws of the State of Colorado, with its principal office located at 12605 East 16th Avenue, Aurora, Colorado 80045.

27.    Defendant Allegheny General Hospital is a domestic not-for-profit corporation duly existing pursuant to, and by virtue of the laws of the State of Pennsylvania, with its principal office located at 320 East North Avenue, Pittsburgh, Pennsylvania 15212.

28.    Defendant New York-Presbyterian Hospital/Weill Cornell Medical Center is a domestic not-for-profit corporation duly existing pursuant to, and by virtue of the laws of the State of New York with its principal office located at 525 East 68th Street, New York, New York 10065.

29.    Defendant University of Missouri Hospital is a domestic not-for-profit corporation duly existing pursuant to, and by virtue of the laws of the State of Missouri, with its

principal office at One Hospital Drive, Columbia, Missouri 65212. The owner and parent company is Curators of the University of Missouri located at 316 University Hall, Columbia, Missouri 65211.

30.    Defendant St. Luke's-Roosevelt Hospital Center doing business as Mount Sinai St. Luke's is a domestic not-for-profit corporation duly existing pursuant to, and by virtue of the laws of the State of New York with its principal office located at 1111 Amsterdam Avenue, New York, New York 10025.

31.    Defendant UCSF Medical Center is a corporation duly existing pursuant to, and by virtue of the law of the State of California, with its principal office located at 505 Parnassus Avenue, San Francisco, California 94143.

32.    Defendant Mayo Clinic Hospital - Saint Mary's Hospital is a domestic not-for-profit corporation duly existing pursuant to, and by virtue of the laws of the State of Minnesota with its principal office located at 1216 2nd Street SW, Rochester, Minnesota 55902.

33.    Defendant University of Pittsburgh Medical Center Presbyterian Hospital is a domestic not-for-profit corporation duly existing pursuant to, and by virtue of the laws of the State of Pennsylvania with its principal office located at 200 Lothrop Street, Pittsburgh, Pennsylvania 15213.

34.    Defendant Memorial Hermann - Texas Medical Center is a domestic not-for-profit corporation duly existing pursuant to, and by virtue of the laws of the State of Texas with its principal office located at 6411 Fannin Street, Houston, Texas 77030. Defendant's Registered Agent is located at 929 Gessner Road, Suite 2586, Houston, Texas 77024.

35.    Defendant Massachusetts General Hospital is a non-profit corporation duly existing pursuant to, and by virtue of the laws of the Commonwealth of Massachusetts, and a

Harvard-affiliated teaching hospital with its principal office located at 55 Fruit Street, Boston, Massachusetts 02114.

36.     Defendant Northwell Health doing business as Long Island Jewish Medical Center is a domestic not-for-profit, acute care hospital duly existing pursuant to, and by virtue of the laws of the State of New York with its principal office located at 270-05 76th Avenue, New Hyde Park, New York 11040.

37.     Defendant John Doe Hospitals 1-86 are additional hospitals duly existing pursuant to the laws of their respective states that submitted false cost reports to the Government resulting in over one million dollars of overpayments per hospital.

38.     The above-listed Defendant Hospitals submit annual cost reports to the Medicare Program and receive indirect medical education payment adjustments from the federal government.

## THE LAW

### A.  *The False Claims Act*

39.     During all times relevant to the facts of this case, the False Claims Act provided in pertinent part that:

> (a) any person who - - (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . . (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit  money or property to the Government,
>
> * * * *
>
> is liable to the United States Government for a civil penalty of not less than $5,500.00 and not more than $10,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28

U.S.C. 2461 Note; Public Law 104-410), plus three times the amount of damages which the Government sustains because of the act of that person.

* * * *

(b) . . . For purposes of this section (1) the terms "knowing" and "knowingly" (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud; (2) the term "claim" (A) means any request or demand, whether under contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; . . . (3) the term "obligation" means an established duty, whether or not fixed, arising from an expressed or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and (4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

31 U.S.C. § 3729 (2009).

## B. The Medicare Program

40.    In 1965, Congress enacted Title XVIII of the Social Security Act, which established the Medicare program to provide health insurance for the elderly and disabled.  42 U.S.C. § 1395, *et seq*.  Medicare is a health insurance program for: people age 65 or older;

people under age 65 with certain disabilities; and people of all ages with end-stage renal disease.  42 U.S.C. § 426; 42 U.S.C. § 426A.

41.    Part A of the Medicare Program authorizes payment for institutional care, including hospital, skilled nursing facility, and home health care.  *See* 42 U.S.C. §§1395c-1395i-4.

42.    In addition, hospitals with qualified graduate medical education programs are entitled to additional Indirect Medical Education payment adjustments as outlined below.

43.    Payments from the Medicare Program come from the Medicare Trust Fund, which is funded through payroll deductions taken from the work force in addition to government contributions.

44.    The Medicare Program is administered through the United States Department of Health and Human Services (HHS) and specifically, the Centers for Medicare and Medicaid Services (CMS), an agency of HHS.

45.    ***Initial enrollment application and updates.***  To participate in Medicare, each provider must execute an initial enrollment application and may be required to update its enrollment information "as part of the periodic revalidation process."  CMS Form 855A, Sections 1, 5, Medicare Enrollment Application, Institutional Providers, *available at* https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms855a.pdf.   As part of the provider's agreement with Medicare, the provider certifies that Medicare's payments are conditioned upon its compliance with Medicare laws, regulations, and program instructions:

> 3. . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction **complying with such laws, regulations, and program instructions** (including, but not limited to, the Federal Anti-Kickback Statute and the Stark law), and on the provider's

compliance with **all applicable conditions of participation in Medicare**.

\* \* \* \*

6.      I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

*Id.* (emphasis added).

46.      After the initial certification, the provider, through its officers, has an **ongoing duty** to notify Medicare if anything on the form becomes untrue or inaccurate:

If I become aware that any information in this application is not true, correct, or complete, I agree to notify the Medicare fee-for-service contractor of this fact in accordance with the time frames established in 42 C.F.R. § 424.516(e).

\* \* \* \*

I agree to notify the Medicare contractor of any future changes to the information contained in this application in accordance with the time frames established in 42 C.F.R. § 424.516(e).  *Id.*

47.      As a further prerequisite to payment by Medicare, including payment of the Indirect Medical Education adjustment, CMS also requires hospitals to submit annually the CMS-2552 form, more commonly known as the hospital cost report.  *See* 42 U.S.C. §1395(g)(a); 42 C.F.R. §413.20; *see also* § 405.1801(b)(1).

48.      Medicare relies upon the information submitted by the hospital in the cost report to calculate the amount of the Indirect Medical Education payment adjustment.

49.      The submission of accurate information on the cost report is material to the Government's decision to pay the claims and payment adjustments.

50.     In order to be reimbursed by Medicare, a hospital executive must execute an

express certification in the cost report. The cost report states as follows:

> MISREPRESENTATION OR FALSIFICATION OF ANY
> INFORMATION CONTAINED IN THIS COST REPORT MAY
> BE PUNISHABLE BY CRIMINAL, CIVIL AND
> ADMINISTRATIVE ACTION, FINE AND/OR
> IMPRISONMENT UNDER FEDERAL LAW.
> FURTHERMORE, IF SERVICES IDENTIFIED IN THIS
> REPORT WERE PROVIDED OR PROCURED THROUGH THE
> PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK
> OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL, AND
> ADMINISTRATIVE ACTION, FINES AND/OR
> IMPRISONMENT MAY RESULT.

51.     This advisory is followed by the following certification language:

> CERTIFICATION BY OFFICER OR ADMINISTRATOR OF
> PROVIDER(S)
>
> I HEREBY CERTIFY that I have read the above certification
> statement and that I have examined the accompanying
> electronically filed or manually submitted cost report and the
> Balance Sheet and Statement of Revenue and Expenses prepared
> by [Provider Name(s)] for the cost reporting period beginning
> [date] and ending [date] and that to the best of my knowledge and
> belief, this report and statement are true, correct, complete and
> prepared from the books and records of the provider in accordance
> with the applicable instructions, except as noted.  I further certify
> that I am familiar with the laws and regulations regarding the
> provision of the health care services, and that the services
> identified in this cost report were provided in compliance with
> such laws and regulations.

### C. Regulations Regarding the Calculation of Indirect Medical Education Payments

52.     Hospitals contract with Medicare to furnish acute hospital inpatient care and agree

to accept predetermined acute inpatient prospective payment system (IPPS) rates as payment in

full.

53.     The IPPS per-discharge payment is based on national base payment rates, or

standardized amounts, for: (1) operating expenses; and (2) capital expenses.

54.     Section 1886(d)(5)(B) of the Social Security Act provides that hospitals with residents in an approved medical education program receive an additional payment adjustment, called the Indirect Medical Education payment adjustment, for every Medicare case paid under the IPPS to reflect the higher patient care costs of teaching hospitals relative to non-teaching hospitals.  42 U.S.C. §1395ww(d)(5)(B).

55.     When Congress established this payment, Congress acknowledged:

> This adjustment is provided in light of doubts...about the ability of the DRG case classification system to account fully for factors such as severity of illness of patients requiring the specialized services and treatment programs provided by teaching institutions and the additional costs associated with the teaching of residents...The adjustment for indirect medical education costs is only a proxy to account for a number of factors which may legitimately increase costs in teaching hospitals.

House Ways and Means Committee Rept, No. 98-25, March 4, 1983 and Senate Finance Committee Rept, No. 98-23, March 11, 1983.

56.     There are two different IME adjustments: (1) one adjustment for the operating expenses; and (2) one adjustment for the capital expenses.

57.     The hospital does not submit claims for the Indirect Medical Education payment adjustment.  Instead, once the adjustment is set based on the information provided by the hospital in the cost report, the hospital receives the adjustment payment on every Medicare discharge until the Indirect Medical Education payment adjustment is reset the following year using the updated data in the cost report.

58.     Under the statute, the amount of the Indirect Medical Education adjustment for **operating** expenses is calculated using the following equation: $c \times [(1+r)^{.405} - 1]$.  C, the multiplier, is set by Congress.  R is the "is the ratio of the hospital's full-time equivalent interns and residents to **beds**."  42 U.S.C. § 1395ww(d)(5)(B)(ii)(emphasis added).

59.    42 U.S.C. § 1395ww(d)(5)(B)(vi)(I) reiterates that "'r' may not exceed the ratio of the number of interns and residents, subject to limit under clause (v), with respect to the hospital for its most recent cost reporting period to the hospital's **available beds** (as defined by the Secretary) during that cost reporting period." (emphasis added).

60.    The teaching hospital's ratio of full-time equivalent residents to the number of beds is based on the information reported by the hospital in the cost report.

61.    Under 42 C.F.R. §412.105(b), the "number of beds" as used in the calculation of the operating IME payment adjustment is defined as follows:

> **(b)** ***Determination of the number of beds.*** For purposes of this section, the number of beds in a hospital is determined by counting the number of available bed days during the cost reporting period and dividing that number by the number of days in the cost reporting period. This count of available bed days excludes bed days associated with -
>
>> **(1)** Beds in a unit or ward that is not occupied to provide a level of care that would be payable under the acute care hospital inpatient prospective payment system at any time during the 3 preceding months (the beds in the unit or ward are to be excluded from the determination of available bed days during the current month);
>>
>> **(2)** Beds in a unit or ward that is otherwise occupied (to provide a level of care that would be payable under the acute care hospital inpatient prospective payment system) that could not be made available for inpatient occupancy within 24 hours for 30 consecutive days;
>>
>> **(3)** Beds in excluded distinct part hospital units;
>>
>> **(4)** Beds otherwise countable under this section used for outpatient observation services, skilled nursing swing-bed services, or inpatient hospice services.
>>
>> **(5)** Beds or bassinets in the healthy newborn nursery; and
>>
>> **(6)** Custodial care beds.

62.     Further guidance on what constitutes "available beds" is provided in the Provider Reimbursement Manual, Pub. 15-1, § 2405.3(G).  The Manual states, "The term 'available beds' as used for the purpose of counting beds is not intended to capture the day-to-day fluctuations in patient rooms and wards being used. Rather, the count is intended to capture changes in the size of a facility as beds are added to or taken out of service."  The Manual further states, "In the absence of evidence to the contrary, beds available at any time during the cost reporting period are presumed to be available during the entire cost reporting period. The hospital bears the burden of proof to exclude beds from the count." *Id*.

63.     Worksheet S-3 is part of the hospital's cost report.  It is entitled "Hospital and Hospital Health Care Complex Statistical Data and Hospital Wage Index Information."  CMS requires hospitals to submit accurate statistical data on Worksheet S-3, Part 1 regarding beds, patient days, discharges, and full-time employees.

64.     Worksheet S-3, Part I, Column 2 requires the hospital to report the "No. of Beds" for each of the lines of data.  Column 3 requires the hospital to report the "Bed Days Available" for each of the rows of data.  *See* Exhibit A.

65.     CMS published the following instructions for reporting "No. of Beds" in Column 2 and "Bed Days Available" in Column 3 on Worksheet S-3, Part 1:

> Column 2—Refer to 42 CFR 412.105(b) and 69 FR 49093-49098 (August 11, 2004) to determine the facility bed count. Indicate the number of beds available for use by patients at the end of the cost reporting period.
>
> A bed means an adult bed, pediatric bed, portion of inpatient labor/delivery/postpartum room (also referred to as a birthing room) bed when used for services other than labor and delivery, or newborn ICU bed (excluding newborn bassinets) maintained in a patient care area for lodging patients in acute, long term, or domiciliary areas of the hospital. Beds in post-anesthesia, post-operative recovery rooms, outpatient areas, emergency rooms,

ancillary departments (however, see exception for labor and delivery department), nurses' and other staff residences, and other such areas that are regularly maintained and utilized for only a portion of the stay of patients (primarily for special procedures or not for inpatient lodging) are not termed a bed for these purposes. (See CMS Pub. 15-1, chapter 22, §2205.)

For cost reporting periods beginning prior to October 1, 2012, beds in distinct ancillary labor and delivery rooms and the proportion of LDP room (birthing room) used for labor and delivery services are not a bed for these purposes.    (See 68 FR 45420 (August 1, 2003)).

For cost reporting periods beginning on or after October 1, 2012, in accordance with 77 FR 53411-53413 (August 31, 2012), beds in distinct labor and delivery rooms, when occupied by an inpatient receiving IPPS-level acute care hospital services or when unoccupied, are considered to be part of a hospital's inpatient available bed count in accordance with 42 CFR 412.105(b) and are to be reported on line 32. Furthermore, the proportion of inpatient LDP room (birthing rooms) beds used for ancillary labor and delivery services is considered to be part of the hospital's available bed count.

Column 3--Enter the total bed days available. Bed days are computed by multiplying the number of beds available throughout the period in column 2 by the number of days in the reporting period. If there is an increase or decrease in the number of beds available during the period, multiply the number of beds available for each part of the cost reporting period by the number of days for which that number of beds was available.

*See* Exhibit B, Medicare Provider Reimbursement Manual, Part 2, Provider Cost Reporting Forms and Instructions, Chapter 40, Form CMS-2552-10, §4005.1 (March 16, 2018).

66.    The Lines on Worksheet S-3 refer to different components. Included below is a replication of the lines of data found in Worksheet S-3, Part I:

| Line number | Component Description |
| --- | --- |
| 1 | Hospital Adults & Peds. (columns 5, 6, 7, 8, and exclude Swing Bed, Observations Bed and Hospice days)(see instructions for col. 2 for the portion of the LDP room available beds) |
| 2 | HMO and other (see instructions) |

| Line number | Component Description |
|---|---|
| 3 | HMO IPF Subprovider |
| 4 | HMO IRF Subprovider |
| 5 | Hospital Adults & Peds. Swing Bed SNF |
| 6 | Hospital Adults & Peds. Swing Bed NF |
| 7 | Total Adult & Peds. (exclude observation beds)(see instructions) |
| 8 | Intensive Care Unit |
| 9 | Coronary Care Unit |
| 10 | Burn Intensive Care Unit |
| 11 | Surgical Intensive Care Unit |
| 12 | Other Special Care |
| 13 | Nursery |
| 14 | Total (see instructions) |
| 15 | CAH visits |
| 16 | Subprovider - IPF |
| 17 | Subprovider - IRF |
| 18 | Subprovider - Other |
| 19 | Skilled Nursing Facility |
| 20 | Nursing Facility |
| 21 | Other Long Term Care |
| 22 | Home Health Agency |
| 23 | ASC (Distinct Part) |
| 24 | Hospice (Distinct Part) |
| 24.10 | Hospice (non-distinct part) |
| 25 | CMHC |
| 26 | RHC/FQHC (specify) |
| 27 | Total (sum of lines 14-26) |
| 28 | Observation Bed Days |
| 29 | Ambulance Trips |
| 30 | Employee discount days (see instructions) |
| 31 | Employee discount days – IRF |
| 32 | Labor & delivery (see instructions) |
| 32.01 | Total ancillary labor & delivery rooms outpatient days (see instructions) |
| 33 | LTCH non-covered days |
| 33.01 | LTCH site neutral days and discharges |

67.    Line 14, Column 3 requires the hospital to report the Total number of Bed Days Available during the reporting period.  The cost report form specifically references CMS' instructions.

19

68.     Worksheet E, Part A is also part of the hospital's cost report.  It is entitled "Calculation of Reimbursement Settlement."  One of the purposes of Worksheet E, Part A is for the hospitals to provide CMS with data to determine the hospital's Indirect Medical Education operating payment adjustment.  CMS requires hospitals to submit accurate data on Worksheet E, Part A regarding the calculation of the Indirect Medical Education payment adjustment.  *See* Exhibit C.

69.     Line 4 on Worksheet E, Part 4 requires hospitals to report "Bed days available divided by number of days in the cost reporting period (see instructions)."  Again, the cost report form specifically references CMS' instructions.

70.     CMS published the following instructions for Worksheet E, Part A, which change over different cost reporting periods:

> Line 4--Enter the result of dividing the number of bed days available (Worksheet S-3, Part I, column 3, line 14) by the number of days in the cost reporting period (365, or 366 in case of leap year). Effective for cost reporting periods beginning on or after October 1, 2012, enter the result of dividing the number of bed days available (Worksheet S-3, Part I, column 3, line 14 plus line 32) by the number of days in the cost reporting period (365, or 366 in case of leap year).

> **NOTE:**     Reduce the bed days available by swing-bed days (Worksheet S-3, Part I, column 8, sum of lines 5 and 6), and the number of observation days (Worksheet S-3, Part I, column 8, line 28). In addition, effective for cost reporting periods beginning on or after October 1, 2011, reduce the bed days available by the number of non-distinct part hospice days (Worksheet S-3, Part I, column 8, line 24.10) and effective for cost reporting periods beginning on or after October 1, 2012, the number of outpatient ancillary labor and delivery days (Worksheet S-3, Part I, column 8, line 32.01).

*See* Exhibit D, Medicare Provider Reimbursement Manual, Part 2, Provider Cost Reporting Forms and Instructions, Chapter 40, Form CMS-2552-10, §4030.1 (March 16, 2018).

71.     As explained in the instructions, hospitals must use data reported in Worksheet S-3, Part I in their calculations on Worksheet E, Part A.

72.     Specifically, starting for cost reporting periods beginning on or after October 1, 2012, the Worksheet E, Part 4 instructions require hospitals to add the number of bed days available as reported on column 3, Line 14 of Worksheet S-3, Part I to the number of bed days available in Labor & delivery on column 3, Line 32 of Worksheet S-3, Part I.

73.     The instructions permit hospitals to reduce the bed days available by the number of swing bed days available as reported on column 8, Lines 5 and 6 of Worksheet S-3, Part I, and the number of observation days as reported on column 8, Line 28 of Worksheet S-3, Part I.

74.     Starting for cost reporting periods beginning on or after October 1, 2011, the instructions permit hospitals to reduce the bed days available by the number of non-distinct part hospice days as reported on column 8, Line 24.10 of Worksheet S-3, Part I.

75.     Starting for cost reporting periods beginning on or after October 1, 2012, the instructions permit hospitals to reduce the bed days available by the number of outpatient ancillary labor and delivery days as reported on column 8, Line 32.10 of Worksheet S-3, Part I.

76.     Other Lines on Worksheet E, Part 4 include data used for the calculation of the number of residents in Line 18.  Line 19 instructs hospitals to divide Line 18 ("Adjusted rolling average FTE count") by Line 4 (Bed days available divided by number of days in the cost reporting period (see instructions)).  This ratio is used in the final Indirect Medical Education payment adjustment calculation for operating expenses.

77.     Using accurate numbers in Worksheet E, Part A is material to the Government's decision to pay for the Indirect Medical Education payment adjustment.

78.     Teaching hospitals also receive an IME payment associated with the **capital** expenses portion of the Medicare IPPS payment. This payment is based on a different formula. Currently the formula is e ^ (.2822*Resident/Average Daily Census)-1. 42 C.F.R. §412.322.

79.     As shown in the formula, for this calculation, instead of using the ratio of residents to available beds, hospitals are permitted to use the ratio of residents to the average daily census. The regulations define average daily census as determined "by dividing the total number of inpatient days in the acute inpatient area of the hospital by the number of days in the cost reporting period." 42 C.F.R. §412.322(a)(2).

80.     Hospitals report the data for this calculation and the final payment adjustment on Worksheet L, Lines 3-6. *See* Exhibit E.

81.     CMS published the following instructions for Worksheet L:

Indirect Medical Education Adjustment

Lines 3 through 6

Line 3--Enter the result of dividing the sum of total patient days (Worksheet S-3, Part I, column 8, lines 14 and 30) by the number of days in the cost reporting period (365, or 366 in case of leap year). Effective for cost reporting periods beginning on or after October 1, 2013, also include in total patient days, the labor and delivery days from Worksheet S-3, Part I, column 8, line 32. Do not include statistics associated with an excluded unit (sub-provider).

> NOTE: Reduce total patient days by nursery days (Worksheet S-3, Part I, column 8, line 13), and swing-bed days (Worksheet S-3, Part I, column 8, lines 5 and 6).

Line 4--Obtain the intern and resident amount from Worksheet E, Part A, line 18, plus line 25.

Line 5--Enter the result of the following calculation: $\{e.^{2822 \text{ x line } 4/\text{line } 3}\}$-1 where e = 2.71828. See 42 CFR 412.322(a)(3) for

limitation of the percentage of I&Rs to average daily census. Line 4 divided by line 3 cannot exceed 1.5.

Line 6--Multiply line 5 by the sum of lines 1 and 1.01, columns 1 and 1.01.

*See* Exhibit F, Medicare Provider Reimbursement Manual, Part 2, Provider Cost Reporting Forms and Instructions, Chapter 40, Form CMS-2552-10, §4064.1.

82.     As evident in these instructions, while hospitals use the same number of residents as reported in the operating expenses portion of the Indirect Medical Education payment adjustment calculation on Worksheet E, the denominator used when calculating the capital expenses portion of the Indirect Medical Education payment adjustment takes into account patient days from the average daily census instead of available bed days.

## FACTUAL ALLEGATIONS

83.     While working on reimbursement issues and cost reports at Children's Hospital (a/k/a Children's National Medical Center) in Washington, D.C., Relator Roark discovered that the hospital falsely underreported the number of "bed days available divided by the number of days in the cost reporting period" on Worksheet E, Part A, Line 4 of its annual Medicare cost reports submitted on CMS Form 2552-10.

84.     As a result of falsely underreporting the number of beds available in Worksheet E, Part A, Children's Hospital fraudulently increased its ratio of residents to beds used in the Indirect Medical Education payment adjustment calculation, thereby causing Children's Hospital to receive millions of additional dollars from Medicare than was appropriate.

85.     In June 2015, Children's Hospital agreed to pay the United States $12.9 million to resolve a number of different allegations, one of which was that the hospital violated the False Claims Act by submitting false cost reports and other applications to the United States that

contained an inaccurate total number of "available beds." *See* Exhibit G, Settlement Agreement between the United States and Children's Hospital.

86. Based on conversations with other industry professionals, Relators became aware that Children's Hospital was not the only hospital perpetrating this fraud.

87. Using their particularized skills and depth of knowledge related to hospital reimbursement issues, Relators set out to determine the amount of overpayments other hospitals had received by fraudulently underreporting the "bed days available divided by the number of days in the cost reporting period" in Worksheet E, Part A of CMS Form 2552-10.

88. Relators obtained data from Worksheet S-3, Part I and Worksheet E, Part A of the cost reports submitted on CMS Form 2552-10 for fiscal years 2011 – present, which covered up to fiscal years 2017 for some hospitals and fiscal year 2018 for other hospitals.

89. Relator Roark used the data reported by the teaching hospitals in Worksheet S-3, Part I to calculate the numbers the teaching hospitals should have reported in Worksheet E, Part A for the operating expenses portion of the Indirect Medical Education payment adjustment.

90. The results were astounding. Relator Roark identified 7,400 cost reports submitted during this time period by hospitals that received Indirect Medical Education payment adjustments. Approximately 22% of the cost reports, including those submitted by the named Defendant Hospitals, fraudulently underreported the number of available beds, thereby fraudulently increasing the operating expenses portion of the Indirect Medical Education payment adjustments received from Medicare.

91. In total, Relators identified over $512 million in overpayments from the Medicare Program related to 658 hospitals falsely underreporting the "bed days available divided by the number of days in the cost reporting period" in Worksheet E, Part A of CMS Form 2552-10 and

thereby falsely inflating the Indirect Medical Education payment adjustments the hospitals received from Medicare.

92.    The Defendant Hospitals submitted these false cost reports despite explicitly certifying to HHS, year after year, that the information contained in the cost reports was "true, correct, complete and prepared from the books and records of the provider in accordance with the applicable instructions."

93.    The Defendant Hospitals acted knowingly or with reckless disregard for the clear Medicare statutes, regulations, and instructions regarding the appropriate way to calculate the "bed days available divided by the number of days in the cost reporting period" in Worksheet E, Part A of CMS Form 2552-10.  In fact, of the 7,400 cost reports reviewed by Relator Roark, 78% of the cost reports reported accurate numbers of available beds in Worksheet E or overreported the number of available beds, thereby causing underpayments from Medicare for the Indirect Medical Education payment adjustments.  The Defendant Hospitals instead chose to profit from fraudulently underreporting their available bed counts.

94.    For example, the following Defendant Hospitals in South Carolina either knowingly or with reckless disregard falsely underreported the "bed days available divided by the number of days in the cost reporting period" in Worksheet E, Part A on CMS Form 2552-10, resulting in the overpayments from the Medicare Program identified in the chart below:

| CMS Certification Number | Provider | Provider's Total Overpayments | False Cost Reports Submitted to the Government |
|---|---|---|---|
| 420004 | MEDICAL UNIVERSITY OF SOUTH CAROLINA | $2,326,268 | 2011, 2012, 2013, 2014, 2016, 2017 |

| CMS Certification Number | Provider | Provider's Total Overpayments | False Cost Reports Submitted to the Government |
|---|---|---|---|
| 420082 | AIKEN REGIONAL MEDICAL CENTER | $430,699 | 2012, 2013, 2014, 2015, 2016, 2017 |
| 420018 | PALMETTO RICHLAND | $252,056 | 2012, 2015 |
| 420085 | GRAND STRAND REGIONAL MEDICAL CENTER | $248,476 | 2016, 2017 |

95.    By way of further example, the following Defendant Hospitals identified below either knowingly or with reckless disregard falsely underreported the "bed days available divided by the number of days in the cost reporting period" in Worksheet E, Part on CMS Form 2552-10, resulting in the overpayments from the Medicare Program identified in the chart below:

| CMS Certification Number | Provider | Provider's Total Overpayments | False Cost Reports Submitted to the Government |
|---|---|---|---|
| 330194 | Maimonides Medical Center | $52,513,729 | 2012, 2013, 2014, 2015, 2016, 2017, 2018 |
| 330241 | Upstate University Hospital | $32,773,169 | 2012, 2013, 2014, 2015, 2016, 2017, 2018 |
| 030111 | Banner University Medical Center South | $19,091,732 | 2012, 2013, 2014, 2015, 2016, 2017, 2018 |
| 330204 | NYC Health + Hospitals Bellevue | $15,933,067 | 2011, 2012, 2013, 2014, 2015, 2016, 2017 |
| 330214 | New York University Langone Tisch Hospital | $14,952,295 | 2012, 2014, 2015, 2016 |

| CMS Certification Number | Provider | Provider's Total Overpayments | False Cost Reports Submitted to the Government |
|---|---|---|---|
| 310015 | Morristown Medical Center | $11,362,582 | 2012, 2013, 2014, 2015, 2016 |
| 330350 | SUNY Downstate Medical Center University Hospital of Brooklyn | $11,236,739 | 2012, 2015 |
| 060024 | UCHealth University of Colorado Hospital | $10,596,593 | 2011, 2012, 2013, 2015, 2016, 2017 |
| 390050 | Allegheny General Hospital | $8,912,150 | 2013, 2015, 2016, 2017 |
| 330101 | New York-Presbyterian Hospital/Weill Cornell Medical Center | $8,636,158 | 2014, 2016, 2018 |
| 260141 | University of Missouri Hospital | $8,376,580 | 2012, 2013, 2014, 2015, 2016, 2017 |
| 330046 | Mount Sinai St. Luke's | $7,618,935 | 2014, 2015, 2016, 2017, 2018 |
| 050454 | UCSF Medical Center at Parnassus | $7,063,062 | 2011, 2013, 2015, 2016 |
| 240010 | Mayo Clinic Hospital - Saint Mary's Campus | $6,283,828 | 2018 |
| 390164 | UPMC Presbyterian | $6,204,132 | 2011, 2012, 2015, 2016, 2017 |
| 450068 | Memorial Hermann - Texas Medical Center | $5,732,221 | 2013, 2014, 2015, 2016, 2017 |
| 220071 | Massachusetts General Hospital | $5,440,866 | 2011, 2012, 2013, 2016, 2017 |
| 330195 | Long Island Jewish Medical Center | $5,305,578 | 2014, 2017, 2018 |

96.     Instead of using accurate data from Worksheet S-3, Part-I in their calculations on Worksheet E, Part A, the Defendant Hospitals used other data to knowingly or recklessly disregard the rules for these calculations and fraudulently increase their Indirect Medical Education payment adjustments on the operating expenses of the Medicare IPPS per-discharge payment.

97.     For example, Relator Roark calculated that St. Luke's University Hospital – Bethlehem, one of the Joe Doe Defendant Hospitals, fraudulently obtained an overpayment of $3.8 million by knowingly or recklessly disregarding the relevant regulations.

98.     In a presentation to industry representatives, Steven J. Frankenbach, the Senior Director of Network Reimbursement Services of St. Luke's University Hospital system, incorrectly described the "typical source" for "bed days available" in the "Operating IME Example" as "current year census by nursing unit."

99.     This is the wrong source to use for the number of bed days available for the operating expenses portion of the Indirect Medical Education payment adjustment.  The accurate number is bed days available as defined in the regulations and accompanying instructions to Worksheets S-3, Part I and Worksheet E, Part A, not the lower census number, which would fraudulently increase the Indirect Medical Education payment the hospital received.  *See* Exhibit H, Graduate Medical Education Financing Basics, Association of Osteopathic Directors and Medical Educators (April 25, 2014) at Slide 6.

100.    Relators believe other hospitals have falsely reported these lower census numbers, which are instead used in the calculation of the capital expenses portion of the Indirect Medical Education payment adjustment, rather than complying with the relevant regulations and instructions for Worksheets S-3, Part I and Worksheet E, Part A, thereby causing the Defendant

Hospitals to obtain fraudulently increased Indirect Medical Education payment adjustments on the operating portion of their Medicare IPPS per-discharge payments.

**COUNT I**
**SCHEMES TO SUBMIT FRAUDULENT CLAIMS**
**31 U.S.C. § 3729 (a)(1)(A)**

101.    Relators incorporate and reallege each allegation in each of the preceding paragraphs as if fully set forth herein.

102.    As a result of the fraud schemes described above, the Defendant Hospitals, by and through their agents, offices, employees, and affiliates, knowingly presented, or caused to be presented, numerous false or fraudulent claims for payment or approval in violation of the FCA, 31 U.S.C. § 3729 (a)(1)(A).

103.    Use of accurate data for the calculations in Worksheet S-3, Part I and Worksheet E, Part A was material to the Government's decision to make payment adjustments on the operating expenses portion of the Medicare IPPS per-discharge payments for the Defendant Hospitals.

104.    As set forth above, ill-gotten gains from the aforementioned presentation of false or fraudulent claims for payment or approval have been distributed to the Defendant Hospitals.

105.    As a direct and proximate result of the false or fraudulent claims knowingly presented or caused to be presented by the Defendant Hospitals, the United States has suffered actual damages and is entitled to recover treble damages, plus a civil monetary penalty, for each false claim.

**COUNT II**
**SUBMISSION OF CLAIMS CONTAINING**
**FALSE EXPRESS OR IMPLIED CERTIFICATIONS**
**31 U.S.C. § 3729 (a)(1)(B)**

106.    Relators incorporate and reallege each allegation in each of the preceding paragraphs as if fully set forth herein.

107.    By virtue of the acts alleged herein, the Defendant Hospitals knowingly made, used, or caused to be made or used, false records or statements—*i.e.*, false certifications and representations made or caused to be made by Defendants—material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

108.    By submitting claims for payment and retaining improperly obtained payments, the Defendant Hospitals expressly and impliedly, if falsely, certified their compliance with the relevant regulations authorizing such payments.

109.    Use of accurate data for the calculations in Worksheet S-3, Part I and Worksheet E, Part A was material to the Government's decision to make payment adjustments to the operating expenses portion of the Medicare IPPS per-discharge payments for the Defendant Hospitals.

110.    As a direct and proximate result of the false or fraudulent claims knowingly presented or caused to be presented by the Defendant Hospitals, the United States has suffered actual damages and is entitled to recover treble damages, plus a civil monetary penalty, for each false claim.

**COUNT III**
**FALSE RECORDS FOR PAYMENT**
**31 U.S.C. § 3729 (a)(1)(B)**

111.    Relators incorporate and reallege each allegation in each of the preceding paragraphs as if fully set forth herein.

112.    The Defendant Hospitals submitted false records or statements to the Government representing that the Defendant Hospitals were entitled to certain amounts of payment adjustments on the operating expenses portion of the Medicare IPPS per-discharge payment.  All such false records or statements were knowingly made and material to the Government to get false or fraudulent claims paid or approved by the Government.

113.    The Defendant Hospitals, thus, knowingly made, used, or caused to be made or used, false records or statements to get excess false or fraudulent claims paid or approved by the Government.

114.    As a direct and proximate result of the false or fraudulent claims knowingly presented or caused to be presented by Defendants, the United States has suffered actual damages and is entitled to recover treble damages, plus a civil monetary penalty, for each false claim.

## **PRAYER**

WHEREFORE, Plaintiffs respectfully prays and demands the following:

(a)    That process issue and service be made upon Defendants to appear and answer this Complaint as provided by law;

(b)    That judgment be entered in favor of Plaintiffs and against Defendants on all counts of the Complaint;

(c)    That Plaintiffs be awarded all damages flowing from Defendants' wrongful acts;

(d)    That Plaintiffs be awarded three (3) times the amount of damages sustained by the United States pursuant to 31 U.S.C. § 3729, *et seq.*;

(e)    That Plaintiffs be awarded a civil penalty for each wrongful act by Defendants, pursuant to 31 U.S.C. § 3729, *et seq.*;

(f)     That Relator Roark and Relator Davis be awarded a portion of all damages, pursuant to 31 U.S.C. § 3729, *et seq.*;

(g)     That Relator Roark and Relator Davis be awarded expenses, attorneys' fees and costs, pursuant to 31 U.S.C. § 3729, *et seq.*;

(h)     That Plaintiffs be awarded such other and further relief as is justified by the facts and law that this Court deems just and proper; and,

(i)     That Plaintiffs be granted a trial by jury.

Submitted this 10th day of April, 2019.

*Counsel for Plaintiff/Relators*

*/s/ William N. Nettles*
WILLIAM N. NETTLES
South Carolina Bar No. 6586
FRAN C. TRAPP
South Carolina Bar No. 6376

LAW OFFICE OF BILL NETTLES
2008 Lincoln Street
Columbia, South Carolina 29201
(803) 814-2826
bill@billnettleslaw.com

MICHAEL J. MOORE*
Georgia Bar No. 520109
CHARLES W. BYRD*
Georgia Bar No. 100850
AIMEE J. HALL*
Georgia Bar No. 318048
ELIZABETH S. WHITE*
Georgia Bar No. 258844

POPE, MCGLAMRY, KILPATRICK, MORRISON
& NORWOOD, P.C.
3391 Peachtree Road, NE, Suite 300
P.O. Box 19337 (31226-1337)
Atlanta, GA  30326
(404) 523-7706
efile@pmkm.com

ROY E. BARNES*
Georgia Bar No. 039000
JOHN BARTHOLOMEW*
Georgia Bar No. 257089

BARNES LAW GROUP, L.L.C.
31 Atlanta Street
Marietta, Georgia 30060
(770) 227-6375
roy@barneslawgroup.com
jbartholomew@barneslawgroup.com

* *Pro Hac Vice* Motion anticipated